**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMALGAMATED SUGAR CO. LLC,
            *Plaintiff-Appellant,*

v.

THOMAS VILSACK;* DEPT. OF
AGRICULTURE,
            *Defendants-Appellees,*

AMERICAN CRYSTAL SUGAR
COMPANY,
            *Intervenor-Appellee.*

No. 07-35971

D.C. No.
CV-06-00167-EJL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
September 15, 2008—Moscow, Idaho

Filed February 11, 2009
Amended April 6, 2009

Before: J. Clifford Wallace, Stephen S. Trott and
N. Randy Smith, Circuit Judges.

Opinion by Judge N. R. Smith

---

*Thomas Vilsack is substituted for his predecessor, Mike Johanns, as United States Secretary of Agriculture, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Kevin J. Brosch, DTB Associates, LLP, Washington, District of Columbia, for the plaintiff-appellant.

Jeffrey Kahn, Office of the General Counsel, U.S. Dept. of Agriculture, Washington, District of Columbia; Joanne P. Rodriguez, Assistant United States Attorney, United States Attorney's Office, Boise, Idaho, for the defendant-appellee.

David P. Bundle and Sarah C.S. McLaren, Fredrikson & Byron, PA, Minneapolis, Minnesota, for the intervenor-appellee.

## ORDER

The opinion in the above-captioned matter filed on February 11, 2009, and published at 555 F.3d 816 (9th Cir. 2009), is amended as follows:

1. On slip Opinion page 1631, line 3, replace "to be" with "are".

2. On slip Opinion page 1632, lines 20-21, replace "Section 1359cc" with "§ 1359cc".

3. On slip Opinion page 1648, lines 13-23, delete in their entirety the two sentences that state:

   Where an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny. *Chevron* deference is also inappropriate where an agency has a self-serving, pecuniary interest in advancing a particular interpretation of a statute. *Cf. Nat'l Fuel Gas Supply v. Fed. Energy Reg. Comm'n*, 811 F.2d 1563, 1571 (D.C. Cir. 1987) (noting that while an agency's interpretation of a statute incorporated into a contract may be entitled to deference, such deference may be inappropriate where the agency itself is a party to the contract).

4. On slip Opinion page 1648, line 14, insert a new paragraph after the sentence ending " . . . Congressional intent." The new paragraph shall read as follows:

   Where an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny to ensure that it is consistent with Congressional intent and the underlying purpose of the statute. We acknowledge that "self-interest alone gives rise to no automatic rebuttal of deference." *See Independent Petroleum Ass'n of America v. DeWitt*, 279 F.3d 1036, 1040 (D.C. Cir. 2002). However, *Chevron* deference may be inappropriate where, as here, (1) the agency has a self-

serving or pecuniary interest in advancing a particular interpretation of a statute, *and* (2) the construction advanced by the agency is arguably inconsistent with Congressional intent. *See Nat'l Fuel Gas Supply v. Fed. Energy Reg. Comm'n*, 811 F.2d 1563, 1571 (D.C. Cir. 1987) (noting that while an agency's interpretation of a statute incorporated into a contract may be entitled to deference, such deference may be inappropriate where the agency itself is a party to the contract); *Chevron*, 467 U.S. at 843 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Having made the foregoing amendments to the opinion, the panel has unanimously voted to deny Appellee's Petition for Panel Rehearing, and so that petition is DENIED. No further petitions for rehearing or rehearing en banc will be accepted.

---

## OPINION

N.R. SMITH, Circuit Judge:

We are asked for the first time to review the construction and application of certain provisions of the Agricultural Adjustment Act (the "Act"), specifically 7 U.S.C. §§ 1359dd(b)(2)(E)-(F).[1] We conclude that the disputed provisions of the Act are unambiguous; therefore, the district court erred in granting *Chevron* deference to the interpretation advanced by the U.S. Department of Agriculture (the "USDA"). Within the Act, we hold that a "processor" is an entity who processes sugar, as defined by the USDA's own regulations and entirely within the natural and ordinary mean-

---

[1] All statutory references herein are to title 7, United States Code, unless otherwise noted, and therefore omit "7 U.S.C." from the citation.

ing of the word. The Act requires the USDA to eliminate a processor's sugar marketing allocation ("allocation") when the processor has "permanently terminated operations (other than in conjunction with a sale or other disposition of the processor or the assets of the processor)." § 1359dd(b)(2)(E). We hold that Pacific Northwest Sugar Company ("Pacific") permanently terminated operations prior to and not in conjunction with the purported sale of assets to Defendant-Intervenor American Crystal Sugar Company ("American Crystal"). Therefore, we conclude that the USDA erred in approving the transfer of the allocation to American Crystal, and Pacific's sugar marketing allocation must be redistributed pro rata among all processors. § 1359dd(b)(2)(E). We reverse the district court's summary judgment in favor of the USDA and American Crystal.

## I.   Factual and Procedural History

Pacific processed sugar beets during the 1998, 1999, and 2000 crop years at its only factory in Moses Lake, Washington. Facing substantial financial problems, Pacific wrote to one of its creditors in January 2001, describing its financial problems, stating that Pacific could not continue to operate in the coming years, and proposing liquidation of the company. Pacific stopped processing sugar at Moses Lake in February 2001, had no sugar beet crops in 2002 or 2003, and never resumed operations. In June 2001, Pacific sold the Moses Lake facility to Central Leasing for $2.1 million and leased the plant back with a twelve-month option to repurchase the facility.[2] Also in June 2001, Pacific unsuccessfully attempted to secure capital to continue as a sugar beet processor. On July 23, 2001, Pacific was administratively dissolved by the Secretary of State of the State of Washington for failure to file an annual license renewal application, as required by Washington State law. Also in 2001, Pacific terminated the major-

---

[2]Although Central Leasing acquired Pacific's plant and equipment, it never sought to acquire Pacific's sugar allocation.

ity of its employees, and by April 2002, Pacific employed no one at its only factory. In March 2002, Pacific's lease of the Moses Lake facility from Central Leasing ended when Pacific failed to pay the agreed rent, and the lease was not renewed.

On May 13, 2002, Congress amended the Act,[3] creating the Flexible Marketing Allotments for Sugar ("FMAS") program. The purpose of the program was to stabilize sugar prices by requiring the Secretary of Agriculture (the "Secretary") to determine the total amount of domestically produced sugar that can be marketed in the United States for the coming year (the "allotment") and then assign allocations for production of sugar to processing companies in the United States. § 1359cc.[4] By rule, the program is administered by the CCC, an agency of the USDA. 7 C.F.R. § 1435.1. Under the program, Congress directed the Secretary to make initial allocations based upon historical beet sugar production levels for the 1998 through 2000 crop years.

In June 2002, Central Leasing began disposing of the equipment formerly owned by Pacific. By July 2002, Pacific owned no sugar beet processing equipment, and its option to repurchase the Moses Lake facility had expired. Also in July 2002, Pacific's Board of Directors indicated that it would no longer expend money for financial or legal consulting. The Board also announced that Washington Sugar Company, LLC ("Washington Sugar") would succeed Pacific and assume any debts or obligations relating to reviving processing operations at Moses Lake. On September 24 and October 3, 2002, Scott

---

[3]*See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134, 187-204 (May 13, 2002).

[4]The overall marketing allocation is divided between sugar derived from sugar beets and sugar derived from sugarcane. § 1359cc(c). This case involves sugar beet sugar allocations. Sugar beet processors who knowingly market sugar or sugar products in excess of their allocation are liable to the Commodity Credit Corporation (the "CCC") for a civil penalty equal to three times the U.S. market value of the sugar involved in the violation. 7 C.F.R. § 1435.318(a).

Lybbert, as President of Washington Sugar,[5] wrote to the CCC to request that Pacific's allocation be transferred to Washington Sugar. The CCC responded on October 11, 2002 that, as a "new entrant," the allocation would be transferred "upon receipt of a copy of the bill of sale showing that virtually all of the assets of Pacific Northwest, including the factory, have been acquired by the Washington Sugar Company."[6] During this same period, appellant, Amalgamated Sugar Company, LLC ("Amalgamated"), and others also inquired of the CCC about acquiring Pacific's allocation.

On October 1, 2002, the CCC made the initial beet sugar marketing allocations for crop year 2002. Pacific received an allocation of 2.692 percent of the allotment, based on its production history for the 1998-2000 crop years.[7] However, the USDA immediately reassigned virtually all the allocation, because Pacific was not processing sugar and was unable to market its share.

In a December 2002 USDA audit, the USDA Inspector General reported that because of financial difficulties, Pacific defaulted on a $20 million USDA guaranteed loan, which resulted in a loss of $12.1 million to the USDA's Rural Development Agency. The USDA audit stated that in May 2001, "[t]he plant closed and the lender was forced to liquidate the company's assets."

On December 3, 2002, the CRSC [8] adopted a resolution

---

[5]The USDA never transferred the allocation to Washington Sugar, we assume because Washington Sugar could not provide a bill of sale showing that it had purchased virtually all of Pacific's assets.

[6]Lybbert was a former Vice-President of Pacific and a member of Columbia River Sugar Company ("CRSC"), as well as the sole owner of Washington Sugar.

[7]The USDA apparently interpreted the Act to require them to make an allocation to Pacific, despite the fact that Pacific was no longer processing sugar.

[8]CRSC is the sugar beet growers' association that wholly owned Pacific.

purporting to transfer its allocation to Washington Sugar, in support of Washington Sugar's efforts to revive operations at Moses Lake. The resolution stated, "CRSC has no desire, interest or ability to move forward and operate [the Pacific] processing facility."

After purporting to convey its interest in the allocation to Washington Sugar and despite the fact that Pacific never used any of its 2002 allocation, representatives of Pacific sought to have the allocation increased for crop year 2003. After a hearing on June 16, 2003, the CCC denied Pacific's request. During the hearing, several processors (including American Crystal) testified that Pacific had been dissolved or seemingly terminated operations and was unlikely to resume operations.[9]

In July 2003, American Crystal began negotiating with Lybbert (on behalf of Washington Sugar) and Central Leasing to purchase the assets previously owned by Pacific, in an effort to secure the transfer of Pacific's allocation by the CCC. On July 3, 2003, American Crystal wrote to the CCC, discussing the proposed acquisition:

> American Crystal[ ] is currently contemplating a transaction, which would effectively result in the allocation, currently owned by [Pacific], being transferred to [American Crystal]. As currently contemplated, substantially all of the assets of [Pacific] would be transferred to an intermediary company[, Washington Sugar]. Since [Pacific] has already transferred ownership of its former processing facility to another party (Central Leasing, LLC), *substantially all of the assets of [Pacific] consists* [sic]

---

[9]For example, the President and CEO of Defendant-Intervenor American Crystal, wrote: "Pacific Northwest has not processed sugarbeets of the 2001 and 2002 crops, and it is our understanding that no sugarbeets have been planted for the 2003 crop. Therefore, it is a real question as to whether it will be able to continue operation in 2003. . . ."

*mainly of the marketing allocation and some other generally immaterial assets.* The next step in the transaction would be the immediate transfer of substantially all of the assets of [Washington Sugar] to [American Crystal] . . . . The effect of the transaction would be to move the sugar marketing allocation from [Pacific], through [Washington Sugar], to [American Crystal].

(emphasis added).

On July 30, 2003, American Crystal informed the CCC of American Crystal's intent to "acquire ownership or control of the assets (including the rights to the production history and the marketing allocations), associated with the Moses Lake, Washington sugarbeet processing factory." In the same letter to the CCC, American Crystal sought the CCC's preliminary approval and informed the CCC that American Crystal had no intention of ever operating the Moses Lake facility.

On August 28, 2003, the CCC replied: "We understand that American Crystal is purchasing all of the assets of Pacific Northwest, securing the rights to make sugar at the Pacific Northwest/Central Leasing factory site, and purchasing some of the sugar making equipment used by Pacific Northwest." The CCC also stated that it would condition approval of the transfer on: (1) receiving documentation of the purchase of Pacific's assets by American Crystal; (2) certification from Pacific that it had not marketed any sugar under the 2002 allocation; (3) waiver by American Crystal and Pacific of rights to bring any action against the USDA in the event that the USDA is required by a court to reverse the transfer of the allocation; and (4) agreement by American Crystal to drop Pacific's appeal of the CCC's June 16, 2003 adverse ruling regarding Pacific's request to increase its allocation for 2003.

On September 8, 2003, Pacific was reinstated as a legal corporation when it filed the necessary documents with the

State of Washington. That same day, Washington Sugar also executed a cancellation agreement with Pacific, revoking the previous transfer of Pacific's allocation to Washington Sugar. These agreements were executed in conjunction with Pacific's purported conveyance of its allocation to American Crystal. That same day, American Crystal advised the CCC that it had acquired, through its wholly owned subsidiary Crab Creek Sugar Company "ownership or control of all of the assets (including the rights to the production history and the marketing allocations) associated with the production of sugar at the Moses Lake, Washington sugarbeet processing factory." American Crystal paid $6.8 million to acquire the allocation, including $2.125 million to Central Leasing, $300,000 to Lybbert (in consideration of a non-compete agreement), and $3.025 million to Pacific. On September 16, 2003, the CCC wrote to Lybbert to inform him that Pacific's allocation would immediately be transferred to American Crystal.

On December 4, 2003, Amalgamated filed a Petition for Review, administratively challenging the CCC's transfer decision. On February 7, 2005, the USDA's Administrative Law Judge ("ALJ") issued a decision ("Initial Decision") reversing the CCC's determination, finding that the transfer was not proper because Pacific had permanently terminated operations.

On February 28, 2005, the CCC appealed the decision to the USDA Judicial Officer ("JO"). The JO reversed the Initial Decision without a hearing and affirmed the CCC's determination. The JO construed the Act to mean that as long as the CCC had not eliminated and redistributed a processor's allocation, that allocation may be sold along with the processor's assets. Amalgamated subsequently appealed to the district court, seeking judicial review of the JO's decision. On cross-motions for summary judgment, the district court deferred to the USDA's construction of the Act and entered summary judgment in favor of the USDA and American Crystal. Amalagamated now appeals.

We are asked to decide whether the JO's interpretation of the Act was reasonable, supported by the administrative record, in accordance with the law, not arbitrary or capricious, and therefore entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

## II.  Standard of Review

We review de novo the district court's decision on cross-motions for summary judgment. *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). We are governed by the same standard used by the trial court and must determine whether the district court correctly applied the relevant substantive law. *See McClung v. City of Sumner*, 548 F.3d 1219, 1224 (9th Cir. 2008). The USDA's "interpretation or application of a statute is a question of law reviewed de novo." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007).

The Administrative Procedure Act governs our review of agency action, and consequently, we must determine whether the USDA's decision was arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706; *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). Our review is "searching and careful, but the arbitrary and capricious standard is narrow, and we cannot substitute our own judgment for that of the [Agency]." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (internal quotation marks omitted).

## III.  The Act Guarantees an Equitable Opportunity to Market Sugar to All Processors

We begin by noting that the Act works to maintain sugar prices by limiting the total amount of sugar that can be produced and marketed, allocating the total sugar allotment for a given crop year among all sugar processors in a fair and equitable manner. *See* § 1359bb. The Act makes clear that its purpose is to "afford all interested persons an equitable oppor-

tunity to market sugar under an allotment" and that "the Secretary shall allocate each such allotment among the processors covered by the allotment." § 1359dd(a). Because the Act places significant restrictions on the freedom of processors to produce and market sugar, the Act's overarching directive is to ensure predictable, fair, and transparent allocation of the allotments to reflect industry events and changes in industry conditions. *See* 148 Cong. Rec. S513, S514 (Feb. 8, 2002) (statement of Sen. Conrad) ("The purpose of this amendment is to provide a predictable, transparent, and equitable formula for the Department of Agriculture to use in establishing beet sugar marketing allotments in the future. . . . [T]he formula allows for adjustments in the reallocation of beet sugar allotments to account for such industry events as the permanent termination of operations by a processor, the sale of a processor's assets to another processor, the entry of new processors, and so on. Taken together, these provisions offer the predictability, fairness, and transparency we all agree is much needed in the sugar beet industry.").

## A. Permanent Termination of Operations Triggers the Requirement that an Allocation be Redistributed or Transferred.

In construing the provisions of the Act, we first look to the language of the statute to determine whether it has a plain meaning. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008). "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.* (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotations omitted)). Here, we conclude that the statutory text is unambiguous.

[1] To maintain an equitable allocation among processors under the FMAS program, Congress directed the USDA to

eliminate the allocation of a processor that permanently terminates operations and redistribute it equitably among *all* processors. Section 1359dd(b)(2)(E) provides:

> If a processor of beet sugar has been dissolved, liquidated in a bankruptcy proceeding, or otherwise has permanently terminated operations (other than in conjunction with a sale or other disposition of the processor or the assets of the processor), the Secretary *shall* —
>
> (i) eliminate the allocation of the processor provided under this section; and
>
> (ii) distribute the allocation to other beet sugar processors on a pro rata basis.

§ 1359dd(2)(E) (emphasis added).[10]

A single processor may receive and exclusively benefit from the allocation of another processor by acquiring the processor or all of the processor's assets. Section 1359dd(b)(2)(F) provides:

> If a processor of beet sugar (or all of the assets of the processor) is sold to another processor of beet sugar,

---

[10]The related USDA regulation in effect in 2003 provides: that the "CCC will eliminate the allocation of the processor who has been dissolved or liquidated in a bankruptcy proceeding and the allocation will be distributed to all other processors on a pro-rata basis." 7 C.F.R. § 1435.308(b) (2003). The USDA subsequently amended this regulation to conform the rule to the statute and to clarify the criteria by which a processor is determined to be permanently terminated. The rule defines permanently terminated operations as "(i) Not processing sugarcane or sugar beets for 2 consecutive years, or (ii) Notifying CCC that the processor has permanently terminated operations." *See* Flexible Marketing Allotments for Sugar, 69 Fed. Reg. 39,811, 39,813 (Jul. 1, 2004) (codified at 7 C.F.R. § 1435.308(b)(3)) (subsequently amended by 69 Fed. Reg. 48,765 (Aug. 11, 2004) and 71 Fed. Reg. 16,198 (Mar. 31, 2006)).

the Secretary ***shall*** transfer the allocation of the seller to the buyer unless the allocation has been distributed to other sugar beet processors under subparagraph (E).

§ 1359dd(2)(F) (emphasis added).

**[2]** Thus, the Act requires the USDA to eliminate and redistribute the allocation of a processor that has permanently terminated operations, except when the *processor* terminated operations because of a sale of the processor or all of its assets to another processor. *See* § 1359dd(b)(2)(E).[11] Even when the USDA has not previously eliminated an allocation, the fact that a processor has permanently terminated operations (other than in conjunction with a sale of the processor or all assets of the processor) cannot be ignored when the USDA is subsequently asked to transfer the allocation pursuant to a purported sale of the processor's assets.

**[3]** Reading the provisions together, before the USDA may grant an allocation transfer request pursuant to a sale, the Act requires: (1) that the buyer and seller are processors covered by the Act; (2) that the seller has not been dissolved, liquidated in a bankruptcy proceeding, or otherwise has not permanently terminated operations, other than in conjunction with the sale or other disposition of the processor or the assets of the processor; and (3) that the sale involves a sale of the processor or all of the assets of the processor. *See* § 1359dd(b)(2)(E)-(F).[12] If any of these conditions is not met,

---

[11]The USDA may find that a processor has temporarily reduced or stopped processing operations, in which case the statute gives the USDA authority to temporarily reassign a processor's allocation to other processors. *See* § 1359ee(b)(2).

[12]The related USDA regulation in effect in 2003 does not provide criteria for when a processor permanently terminates operations, but does provide: "Subject to paragraph (a) of this section [regarding requests from growers to transfer an allocation from a closed facility], CCC will eliminate the allocation of the processor who has been dissolved or liquidated in a bankruptcy proceeding and the allocation will be distributed to all other processors on a pro-rata basis." 7 C.F.R. § 1435.308 (2003).

the USDA cannot approve the transfer pursuant to a sale. Amalgamated argues that the transfer was not proper because Pacific was no longer a processor, since it had permanently terminated operations before (and not in conjunction with) the purported sale of assets to American Crystal. The USDA and American Crystal both argue that subparagraph (F) required the USDA to transfer Pacific's allocation because the USDA had not previously eliminated and redistributed Pacific's allocation pursuant to subparagraph (E). The district court deferred to this interpretation, concluding that it was reasonable, not arbitrary or capricious, and supported by the administrative record. We disagree with the district court and agree with Amalgamated.

**B. The District Court Erred When it Deferred to the USDA's Interpretation of the Statutory Term "Processor".**

**[4]** The district court deferred to the USDA's interpretation of the statutory term "processor" in its decision, granting *Chevron* deference to the JO decision. We conclude that the district court erred. First, the term "processor" is not ambiguous as used in the Act. Second, the interpretation advanced by the USDA is not reasonable, because it is contrary to the USDA implementing regulation.

In reviewing the USDA's interpretation of a statute that it administers, the court must follow the two-step approach set out in *Chevron*, 467 U.S. at 842-44. The first step is to determine whether Congress has unambiguously expressed its intent on the issue before the court. *Natural Res. Def. Council v. U.S. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008) (citing *Chevron*, 467 U.S. at 843 n.9). If the intent of Congress is clear, such as when the statute expressly defines the disputed term, the court "must follow that definition, even if it varies from that term's ordinary meaning." *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1238 (9th Cir. 2005) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)).

If the statute is silent or ambiguous, the court must then decide whether the agency's interpretation "is based on a permissible construction of the statute." *Natural Res. Def. Council*, 526 F.3d at 602 (citing *Chevron*, 467 U.S. at 843). Where Congress explicitly or implicitly delegates legislative authority to the agency, the court must defer to an agency's statutory interpretation so long as it is reasonable and not arbitrary and capricious. *Id.* The court must consider the agency's position over time, and if the agency's interpretation of a relevant provision conflicts with the agency's earlier interpretation, the agency is "entitled to considerably less deference than a consistently held agency view." *Id.* (citations omitted). This deference also does not extend to " 'agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.' " *Ashoff v. City of Ukiah*, 130 F.3d 409, 411 (9th Cir. 1997) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)).

The agency's own regulations are significant and cannot be disregarded when interpreting a statute. *See Vance v. Hegstrom*, 793 F.2d 1018, 1025 (9th Cir. 1986). An agency's interpretation of its own regulation is not entitled to deference if it is "plainly erroneous or inconsistent with the regulation." *See Auer v. Robbins*, 519 U.S. 452, 461-63 (1997) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). "A regulation has the force of law; therefore, an agency's interpretation of a statute in a manner inconsistent with a regulation will not be enforced." *Nat'l Med. Enters. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988).

In this case, the Act does not define the terms "processor" or "processor of beet sugar." However, where a term is not ambiguous, its plain and ordinary meaning should be ascribed unless there is clear evidence to the contrary that Congress intended a different meaning. *See Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1341 (9th Cir. 1990).

[5] We note that the term "processor" does not have any independent legal significance. One dictionary defines the

word to mean "one that processes agricultural products, foods, or similar products." *See* Webster's Third New International Dictionary 1808 (1993). Two other common dictionaries likewise define "processor" as "one that processes." *See* The American Heritage College Dictionary 987 (2d ed. 1985); Webster's II New Riverside University Dictionary 938 (1984).

**[6]** Within the relevant provisions of the Act, we read "processor" to mean an entity who processes sugar, entirely within the natural and ordinary meaning of the word. For example, the Act requires the Secretary to establish allotments of sugar for "marketing by processors of sugar processed from . . . sugar beets . . . ." *See* § 1359bb(b)(1). The sugar marketing allotments "shall apply to the marketing by *processors* of sugar . . ." § 1359bb(c)(1) (emphasis added). A "processor" is not allowed to market more sugar than it has been allocated. *See id.* at § 1359bb(d). The Act consistently uses "processor" to exclusively refer to that class of entities who process sugar. We find the term unambiguous and nothing in the Act contradicts or confuses the ordinary meaning.

**[7]** Within the Act, it is not receipt of an allocation that makes an entity a processor, but rather the processing of sugar beets that entitles one to an equitable allocation. The Act directs, and therefore presumes, that any entity that processes sugar will have an equitable opportunity to market sugar and therefore receive an allocation. § 1359dd(a).[13] The initial allocations were made to processors who had actual, historical production during the 1998-2000 crop years. § 1359dd(b)(2)(C). New processors, referred to as "new entrants," are equally entitled to an allocation under the Act

---

[13]The Act provides that "Whenever marketing allotments are established for a crop year under section [1359cc of this title], in order to afford all interested persons an equitable opportunity to market sugar under an allotment, the Secretary shall allocate each such allotment among the processors covered by the allotment." § 1359dd(a).

when they start processing sugar beets or acquire an ongoing factory with a production history. § 1359dd(b)(2)(H)-(I). Maintenance of the allocation is also conditioned on continuing operations and processing of sugar. *Id.* at § 1359dd(b)(2)(E)-(F). Thus, we conclude that actual processing and capacity to produce sugar are what make an entity a processor, and it is this status as a processor that entitles it to an allocation.

The USDA argues that if the ordinary meaning of the term is applied, then Pacific could not have received the original allocation on October 1, 2002, because by that time Pacific was no longer processing sugar. Likewise, the USDA contends that if Pacific were not a "processor," the USDA could not have temporarily reassigned Pacific's allocation to other processors for crop years 2002 and 2003.[14] We are not asked to review the propriety of the original allocations or the temporary reassignments made by the USDA under the Act. Nonetheless, we find it unlikely that Congress intended that the USDA give a defunct sugar company, incapable of processing or marketing sugar, a sugar marketing allocation. The fact that the USDA gave the defunct Pacific an original allocation, which it temporarily reassigned to other processors, has no impact on our interpretation of this unambiguous statutory term.

The USDA also urges that "processor" must mean an entity with an allocation, because the provisions regarding disposition of an allocation upon termination of operations or sale of assets uses that term, and the provisions would not apply unless a "processor" had an allocation. § 1359dd(b)(2)(E) & (F). This argument is not persuasive. As we stated above, the

---

[14]If a processor with a share of the allotment will be unable to market all of the allocation during a particular crop year, the Secretary may temporarily reassign to the "deficit" for that crop year. § 1359ee(b)(2). The reassignment is redistributed to the other processors depending on their capacity to fill a portion of the deficit. *Id.*

Act presumes that all processors will receive an equitable allocation, and therefore it is true that a processor would have or be entitled to an allocation. However, this does not mean that a processor is only a processor because it has an allocation.

[8] To the extent that the USDA's argument exposes any ambiguity in the statute, which we do not believe it does, the USDA's interpretation is not reasonable and not entitled to deference, because it conflicts with the USDA's own implementing regulations. *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994) (refusing to defer to the USDA's construction of a statutory term because it was inconsistent with the plain language of the statute and contrary to the agency's own regulation). The USDA implementing regulation provides, "[s]ugar beet processor means a person who commercially produces sugar, directly or indirectly, from sugar beets (including sugar produced from sugar beet molasses), has a viable processing facility, and a supply of sugar beets for the applicable allotment year." 7 C.F.R. § 1435.2 (2003).[15] The district court acknowledged this regulatory definition, but concluded that the interpretation advanced by the USDA was "reasonable given the use of the word throughout the statute." We disagree. The USDA's proposed interpretation that a processor is an entity that has an allotment, even if it is not processing anything, is not reasonable, precisely because it conflicts with its own regulation. *See Nat'l Med. Enters.*, 851 F.2d at 293-94.

[9] Accordingly, we hold that the district court erred in deferring to the definition of the term "processor" advanced by the USDA. Within the Act, the term is unambiguous and used in a manner consistent with its natural and ordinary

---

[15]This definition has not changed since the rule was first effected. *Compare* 2002 Farm Security and Rural Investment Act of 2002 Sugar Programs and Farm Facility Storage Loan Program, 67 Fed. Reg. 54,926, 54,930 (Aug. 26, 2002) *with* 7 C.F.R. § 1435.2 (2008).

meaning. The USDA's interpretation, advanced in the present dispute, not only conflicts with the ordinary meaning of the word but also conflicts with the USDA's own regulatory definition of the term.

## C. Pacific Permanently Terminated Operations and Ceased Being a Processor Prior to the Purported Sale of Assets to American Crystal.

There is no dispute that Pacific was a sugar beet processor during the 1998 through 2000 crop years. Whether Pacific was a "processor" by the time it purported to sell its assets to American Crystal in September 2003 depends on when and under what circumstances Pacific permanently terminated operations. We conclude that Pacific ceased being a processor when it permanently terminated operations prior to the purported sale to American Crystal.

[10] After five days of evidentiary hearings, the ALJ found that Pacific had permanently terminated operations before the purported sale of assets to American Crystal. The record strongly supports this finding, given that Pacific had not processed sugar beets since February 2001. Pacific sold its factory and assets in June 2001 and had no sugar beet crops in 2001, 2002 or 2003. The State of Washington administratively dissolved Pacific in July 2001, even though it was subsequently reinstated in September 2003 in connection with the transaction with American Crystal. Pacific lost its lease and option to repurchase its factory in July 2002. Pacific's Board of Directors also adopted a December 2002 resolution purporting to convey its allocation to Washington Sugar and stating that "CRSC has no desire, interest or ability to move forward and operate [the Pacific] processing facility." The JO did not refute these findings.

Instead, the JO reasoned that as long as the USDA had not previously eliminated the allocation, it was available to be transferred pursuant to a sale. There is no basis for this rea-

soning. The determinative factor on the availability of the allocation is whether a processor has permanently terminated operations, not whether the USDA has failed to act. If we upheld the interpretation advanced by the USDA, the propriety of a transfer would not depend on events in the sugar beet industry, as Congress intended, but on whether the USDA has been diligent in fulfilling its statutory duties. Allowing such an interpretation would result in an arbitrary and capricious outcome that would be contrary to the intent of Congress.

We also conclude that the USDA had a self-serving and, possibly, a financial interest in interpreting the Act to allow the transfer of Pacific's allocation to American Crystal. First, the USDA gained administrative advantage by conditioning approval of the transfer on (1) waiver by American Crystal and Pacific of rights to bring any action against the USDA in the event that the USDA is required by a court to reverse the transfer of the allocation; and (2) agreement by American Crystal to drop Pacific's appeal of the CCC's June 16, 2003 adverse ruling regarding Pacific's request to increase its allocation for 2003. The record also indicates that the USDA may have had a financial interest in approving the transfer. Pacific owed the USDA as much as $12.1 million after Pacific defaulted on a $20 million loan guaranteed by the USDA. Pacific received $3.025 million in payment from American Crystal for the sale of the allocation. As a creditor of Pacific, the USDA may have had a financial interest in approving the transfer. Even if the USDA received no direct financial benefit, the existence of a possible pecuniary interest is of concern in evaluating the manner in which the USDA administered the Act and interpreted its provisions. We are troubled that the USDA may have acted more out of concern for administrative convenience and self-interest, rather than with an interest in administering the Act according to statutory requirements and Congressional intent.

Where an agency interprets or administers a statute in a way that furthers its own administrative or financial interests,

the agency interpretation must be subject to greater scrutiny to ensure that it is consistent with Congressional intent and the underlying purpose of the statute. We acknowledge that "self-interest alone gives rise to no automatic rebuttal of deference." *See Independent Petroleum Ass'n of America v. DeWitt*, 279 F.3d 1036, 1040 (D.C. Cir. 2002). However, *Chevron* deference may be inappropriate where, as here, (1) the agency has a self-serving or pecuniary interest in advancing a particular interpretation of a statute, *and* (2) the construction advanced by the agency is arguably inconsistent with Congressional intent. *See Nat'l Fuel Gas Supply v. Fed. Energy Reg. Comm'n*, 811 F.2d 1563, 1571 (D.C. Cir. 1987) (noting that while an agency's interpretation of a statute incorporated into a contract may be entitled to deference, such deference may be inappropriate where the agency itself is a party to the contract); *Chevron*, 467 U.S. at 843 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

[11] The uncontradicted findings of the ALJ show that Pacific permanently terminated operations prior to the purported sale of assets to American Crystal. Accordingly, Pacific was no longer a processor at the time of the purported sale. Because the permanent cessation of operations requires redistribution, the USDA should have redistributed Pacific's allocation among all processors pro rata as required by law.

## D.  Termination of Operations Not in Conjunction with a Sale of All Assets.

The USDA argues that, even if Pacific terminated operations, the USDA was not required to redistribute the allocation among all processors, because Pacific permanently terminated operations in conjunction with a sale or other disposition of the processor or the assets of the processor. *See* § 1359dd(b)(2)(E). The JO agreed. The district court expressed concern that there was no sale of "all the assets of

the processor," but nonetheless affirmed, finding the JO's conclusions to be reasonable and not arbitrary or capricious. We find this conclusion to be unreasonable and not supported by the record.

**[12]** American Crystal did not purchase Pacific itself. Thus, in order to satisfy the prerequisites for transfer, American Crystal must have purchased *all* of Pacific's assets. *See* § 1359dd(b)(2)(F). Yet, Pacific's assets were liquidated well before the purported sale to American Crystal. The factory and all Pacific's processing equipment had been previously liquidated and sold to Central Leasing. American Crystal acknowledged that Pacific's remaining assets largely included "the marketing allocation and some other generally immaterial assets."

The USDA and American Crystal argue that to satisfy the requirements of the Act, the asset sale need only be "a sale of those assets that the processor has at the time, not those which the processor may have owned in the past." Therefore, the USDA argues that it is not relevant that the assets sold were immaterial so long as they include all the assets Pacific had at the time of the sale. We agree that the sale of all of Pacific's assets need not include all of the assets Pacific ever owned. However, the fact that Pacific had no material assets at the time of the sale is problematic.

**[13]** First, at the time of the sale to American Crystal, Pacific's only purported asset of any value was its marketing allocation. The JO concluded that "if a beet sugar processor has a beet sugar marketing allocation, that allocation can be sold in connection with a sale of the assets of the beet sugar processor." We conclude this to be an erroneous statement of the law. A marketing allocation can be transferred only upon a sale of all assets belonging to a processor. § 1359dd(b)(2)(F). Under the Act, however, while an allocation inevitably adds value to a processor, it is not an asset itself that can be owned or conveyed by the processor. As

Amalgamated persuasively argues, an FMAS marketing allocation is "a right in the nature of a government license; it can be conveyed only by an act of the Secretary of Agriculture." The USDA has near plenary control over the allocations, subject to the mandates of the Act. The USDA must modify the allocations whenever a processor sells a factory or a new processor enters the industry, reopens a factory, or acquires an operating factory with a production history. *See* § 1359dd. The allocation is also subject to the requirement that it "be shared among producers served by the processors in a fair and equitable manner." *See* § 1359ff. When a processor closes, growers have the right to request that the USDA transfer the allocation to an alternate processor where they will deliver their crops. The USDA can also temporarily reassign an allocation when a processor is unable to fully use it in a given crop year. *See* § 1359ee. Notably, the USDA is not required to compensate a processor for reductions in the allocation or seek the processor's permission. We conclude, as the ALJ did, that "[f]or there to be a 'sale of all assets,' more than the marketing allocation itself needs to be conveyed."[16]

**[14]** Second, assuming for the sake of argument that the sale of purely immaterial assets were sufficient, the fact that Pacific did not have any tangible assets of any value confirms that it was no longer a processor and that its permanent termination of operations was not in conjunction with but prior to and independent of the sale to American Crystal. We acknowledge that, if Pacific's only remaining assets were good will, production rights, production history, books, and records, it would not be unreasonable to conclude that Ameri-

---

[16]The fact that American Crystal ultimately purchased from Central Leasing some of the assets formerly owned by Pacific does not affect our analysis. Central Leasing was not a sugar processor and never acquired Pacific's allocation. Therefore, a purchase of assets from Central Leasing does not entitle American Crystal to a transfer of Pacific's allocation. Under the Act, for the USDA to approve a transfer of an allocation in conjunction with the sale of assets, both the purchaser and seller must be processors. *See* § 1359dd(b)(2)(E).

can Crystal purchased *all* of Pacific's assets. However, this does not mean that Pacific was a processor at the time of the sale or that it terminated its operations in conjunction with the sale. Rather, the absence of material assets is a strong confirmation that Pacific permanently terminated operations prior to the sale. We believe the reasoning of the ALJ is persuasive in determining that Pacific did not terminate operations in conjunction with the purported sale to American Crystal. If Pacific had retained the assets it sold to American Crystal, could it have continued operations? Pacific had no financing, no equipment, no sugar beet crop, no factory, no right to operate a factory, and had not produced sugar for over two years. As the ALJ noted, "The record in this case makes it abundantly clear that when the sale to American Crystal took place, Pacific Northwest was no longer able to ever again process beets into sugar. It had neither the physical assets [n]or the will."

## IV.  Conclusion

We are sympathetic to the principals and investors of Pacific who sought to salvage what value they might from their failed investment. We also recognize that it was good business for American Crystal to seek to secure Pacific's marketing allocation solely for itself. The transaction between Pacific and American Crystal was a crafty effort to circumvent the Act's clear directive and avoid an equitable redistribution of Pacific's allocation, in favor of a single processor. However, when a sugar processor permanently terminates operations, Congress mandated that the USDA fairly and equitably redistribute the failed processor's allocation among all processors. The USDA failed to fulfill its responsibilities in this regard. It put administrative expediency ahead of the intent of Congress and sanctioned a questionable transaction that was attempting to resurrect a dead company for the sole purpose of effecting the transfer of its sugar marketing allocation.

We reverse the district court's order granting summary judgment in favor of the USDA and American Crystal. We remand for further proceedings consistent with this opinion. We award costs on appeal to Appellant, Amalgamated.

**REVERSED and REMANDED.**