**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VINCENT HARRIS YAZZIE,

        *Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

        *Respondent*,

GILA RIVER INDIAN COMMUNITY;
NAVAJO NATION; CENTRAL ARIZONA
WATER CONSERVATION DISTRICT;
SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT AND POWER
DISTRICT,

        *Respondents-Intervenors*.

No. 14-73100

| | |
|---|---|
| TO' NIZHONI ANI; BLACK MESA WATER COALITION; DINE CITIZENS AGAINST RUINING THE ENVIRONMENT, *Petitioners*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; SCOTT PRUIT, Administrator,[*] United States Environmental Protection Agency, *Respondents*, <br><br> GILA RIVER INDIAN COMMUNITY; NAVAJO NATION; CENTRAL ARIZONA WATER CONSERVATION DISTRICT; SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, *Respondents-Intervenors.* | No. 14-73101 |

---

[*] Scott Pruitt, Administrator of the Environmental Protection Agency, is substituted for his predecessor, Gina McCarthy, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

NATIONAL PARKS CONSERVATION
ASSOCIATION; SIERRA CLUB; GRAND
CANYON TRUST; NATURAL
RESOURCES DEFENSE COUNCIL,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; SCOTT PRUITT,
Administrator, United States
Environmental Protection Agency,
*Respondents*,

GILA RIVER INDIAN COMMUNITY;
NAVAJO NATION; CENTRAL ARIZONA
WATER CONSERVATION DISTRICT;
SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT AND POWER
DISTRICT,
*Respondents-Intervenors*.

No. 14-73102

OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted November 18, 2016
San Francisco, California

Filed March 20, 2017

Before:  Mary M. Schroeder, Stephen S. Trott,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

## SUMMARY[**]

### Environmental Law

The panel denied petitions for review brought by tribal conservation organizations and non-profit environmental organizations challenging the United States Environmental Protection Agency's source-specific federal implementation plan ("FIP") under the Clean Air Act for the Navajo Generating Station, a coal-fired power plant on the Navajo Nation Reservation in Arizona.

The panel held that the federal government's partial ownership of the Station did not eliminate any deference to the EPA's interpretation of the Clean Air Act and its implementing regulations.

The Clean Air Act invites States to submit to the EPA a State Implementation Plan setting forth emission limits and other measures to improve air visibility. If a State elects not to submit a State Implementation Plan, or the EPA rejects the State's plan, the EPA must generate a FIP to fill any resulting gaps.  Regional haze State Implementation Plans must identify the "best available retrofit technology"

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

("BART") to reduce emissions from major emission sources, like the Station. A State can bypass BART with a "better than BART" alternative.

In 1998, the EPA issued its Tribal Authority Rule, which created a mechanism for tribes to develop a Tribal Implementation Plan, similar to a State Implementation Plan, to carry out the Clean Air Act's requirements on tribal land. Because tribes are not required to adopt Tribal Implementation Plans, the Tribal Authority Rule authorizes the EPA to promulgate a FIP to fill in any gaps.

The panel held that the instant FIP was not subject to the Clean Air Act's five-year deadline to implement BART because the FIP promulgated a "better than BART" alternative – not BART.

Under the Regional Haze Regulations for a BART alternative, a State Implementation Plan must "require[] that all necessary emission reductions take place during the period of the first long-term strategy for regional haze." 40 C.F.R. § 51.308(e)(2)(iii). The panel held that the EPA reasonably concluded that the Tribal Authority Rule applied because the Navajo Nation had not submitted a tribal implementation plan, which gave the EPA authority to promulgate a FIP for nitrogen oxides emissions at the Station. The panel further held that the EPA reasonably interpreted the Tribal Authority Rule, 40 C.F.R. §§ 49.4(e), 49.11(a), and the Regional Haze Regulations to conclude that the emission reductions in § 51.308(e)(2)(iii) did not apply to FIPs for regional haze that are promulgated in place of tribal implementation plans.

The panel held that it was reasonable for the EPA to give the Station an emission credit when evaluating if the BART

alternative "results in greater emission reductions," 40 C.F.R. § 51.308(e)(3), than BART. The panel deferred to the EPA's reasonable determination that the FIP alternative was "better than BART" for nitrous oxide emissions.

The panel held that it was a reasonable exercise of the EPA's discretion not to determine BART for particulate matter for the Station.

## COUNSEL

Brad A. Bartlett (argued), Environmental Law Clinic, University of Denver Sturm College of Law, Denver, Colorado; John Barth, Hygiene, Colorado; for Petitioners To-Nizhoni Ani, Black Mesa Water Coalition, and Dine Citizens Against Ruining our Environment.

Vincent Harris Yazzie, pro se Petitioner.

Janette K. Brimmer (argued) and Amanda W. Goodin, Earthjustice, Seattle, Washington; Neil Levine, Staff Attorney, Grand Canyon Trust, Denver, Colorado; for Petitioners National Parks Conservation Association, Sierra Club, Grand Canyon Trust, Natural Resources Defense Council.

David A. Carson (argued), Environment & Natural Resources Division, United States Department of Justice, Denver, Colorado; Daniel R. Dertke, Environmental Defense Section; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Ann Lyons, Office of Regional Counsel, United States Environmental Protection Agency, Region 9, San Francisco,

California; Lea Anderson, Office of the General Counsel, United States Environmental Protection Agency, Washington, D.C.; for Respondents.

Aaron M. Flynn (argued), Norman W. Fichthorn, and William L. Wehrum, Hunton & Williams LLP, Washington, D.C., for Respondent-Intervenor Salt River Project Agricultural Improvement and Power District.

Colin Wittman Bradley (argued), and Katherine Belzowski, Attorneys; Paul Spruhan, Assistant Attorney General; Ethel B. Branch, Acting Attorney General; Navajo Nation Department of Justice, Window Rock, Arizona; for Respondent-Intervenor Navajo Nation.

John B. Capehart, Z.W. Julius Chen, Merrill C. Godfrey, and Donald R. Pongrace, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Thomas L. Murphy and Linus Everling, Gila River Indian Community Office of General Counsel, Sacaton, Arizona; for Respondents-Intervenors Gila River Indian Community.

David L. Bernhardt and Ryan A. Smith, Brownstein Hyatt Farber Schreck LLP, Washington, D.C., for Respondent-Intervenor Central Arizona Water Conservation District.

**OPINION**

OWENS, Circuit Judge:

Petitioners Vincent Yazzie, several tribal conservation organizations, and certain non-profit environmental organizations (collectively "petitioners")[1] seek final review of the United States Environmental Protection Agency's ("EPA") source-specific Federal Implementation Plan ("FIP") under the Clean Air Act ("CAA") for the Navajo Generating Station, a coal-fired power plant on the Navajo Nation Reservation in Arizona.[2]  We have jurisdiction over these petitions, 42 U.S.C. § 7607(b)(1), and we deny them.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The Navajo Generating Station

The Navajo Generating Station ("Station") is the largest coal-fired plant in the western United States, and emits nitrogen oxides ("NOx") that affect visibility at Class I national parks and wilderness areas, including the Grand Canyon.  The Station powers a water distribution system that meets over 20% of Arizona's water demands.  78 Fed. Reg. 8,274, 8,275, 8,283 (Feb. 5, 2013).  Coal from the Kayenta Mine, located on both Navajo and Hopi Tribe lands, powers

---

[1] These consolidated cases are related to *Hopi Tribe v. EPA*, No. 14-73055, a case that was severed from the instant cases and is addressed in a separate concurrently filed opinion.

[2] "We apologize for the extensive use of acronyms in this opinion and include a brief glossary at the end to aid the reader.  Environmental litigation is awash in such alphabetical shorthand, and the 'insiders' would not know what we meant if we used other terms." *Arizona v. EPA*, 815 F.3d 519, 525 n.3 (9th Cir. 2016).

the Station and employs many tribal members, and taxes and royalties from the coal are significant parts of the tribes' revenues. *Id.* at 8,275. Under the proposed amended lease of the land from the Navajo Nation to the owner-operators of the Station, the Station would operate until 2044, when it would cease conventional coal-fired generation of electricity. 79 Fed. Reg. 46,514, 46,532 (Aug. 8, 2014); 78 Fed. Reg. 62,509, 62,514 (Oct. 22, 2013). After 2044, the Navajo Nation has the option to continue the Station as a "new source" that generates electricity without coal. 79 Fed. Reg. at 46,532. Several entities, including four utilities (the Salt River Project, Arizona Public Service Co., NV Energy, and Tucson Electric Power), and the Department of Interior (through the U.S. Bureau of Reclamation), co-own the Station. *Id.* at 46,514. The utilities operate the Station; terms of the lease bar the Navajo Nation from controlling or regulating the operation of the Station. *See Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1178 n.1 (9th Cir. 2012).

## B. The Clean Air Act's Visibility Protections

The 1990 amendments to the CAA expanded the CAA's focus to include regional haze, which is "visibility impairment that is caused by the emission of air pollutants from numerous sources located over a wide geographic area." 40 C.F.R. § 51.301; *see also* 42 U.S.C. § 7492. Emissions of fine particles (such as sulfates, nitrates, and other particulate matter) and their precursors (e.g., $SO_2$, NOx) produce regional haze. 64 Fed. Reg. 35,714, 35,715 (July 1, 1999). In 1999 and again in 2005, the EPA issued Regional Haze Regulations, and guidelines. 40 C.F.R. § 51.300-09; 70 Fed. Reg. 39,104, 39,156–72 (July 6, 2005). The Regulations set a goal of achieving natural visibility by 2064. 40 C.F.R. § 51.308(d).

The CAA "invites each State to submit to EPA a 'State Implementation Plan' ("SIP") setting forth emission limits and other measures necessary to make reasonable progress toward the national visibility goal." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1138 (9th Cir. 2015) (citing 42 U.S.C. §§ 7410(a), 7491(b)(2)). If a State elects not to submit a SIP, or if the EPA rejects a SIP in part or in whole, the EPA must generate a Federal Implementation Plan ("FIP") to fill any resulting gaps. *Id.* at 1138–39 (citing 42 U.S.C. § 7410(c)(1)(A)).

Regional haze SIPs must identify the "best available retrofit technology" ("BART") to reduce emissions from certain major emission sources, like the Station. 42 U.S.C. § 7491(b)(2). BART is "an emission limitation based on the degree of reduction achievable through the application of the best system of continuous emission reduction for each pollutant which is emitted by an existing stationary facility." 40 C.F.R. § 51.301. Five factors dictate BART for a particular source of regional haze.[3] Any source subject to BART must install and operate the appropriate technology "as expeditiously as practicable but in no event later than five years" after approval of a SIP or issuance of a FIP. 42 U.S.C. § 7491(g)(4).

A State can bypass BART with a "better than BART" alternative. *See Arizona*, 815 F.3d at 526; *see also* 40 C.F.R. § 51.308(e)(2). For a state to adopt a BART alternative, its SIP must "require[] that all necessary emission reductions

---

[3] These factors are: (1) the costs of compliance; (2) the energy and nonair quality environmental impacts of compliance; (3) any existing pollution control technology in use at the source; (4) the remaining useful life of the source; and (5) the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. 42 U.S.C. § 7491(g)(2).

take place during the period of the first long-term strategy for regional haze." 40 C.F.R. § 51.308(e)(2)(iii). In one of three ways, a State can demonstrate "better-than-BART" through "greater reasonable progress: (1) "[i]f the distribution of emissions is not substantially different than under BART, and the alternative measure results in greater emission reductions"; (2) "[i]f the distribution of emissions is significantly different," then a State must conduct "dispersion modeling," which focuses on visibility rather than emissions; or (3) the catch-all "otherwise based on the clear weight of the evidence." 40 C.F.R. § 51.308(e)(2)(i)(E), (e)(3).

## C. Tribal Authority Rule

The 1990 CAA Amendments authorized the EPA "to treat Indian Tribes as States" if certain conditions were met, and to issue regulations outlining when that treatment should occur. 42 U.S.C. § 7601(d)(1)(A). The Amendments also permitted the EPA to directly administer haze reduction efforts on tribal lands if it "determine[d] that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible[.]" *Id.* § 7601(d)(4).

In 1998, the EPA issued its "Tribal Authority Rule" ("TAR"), which created a mechanism for tribes to develop a "Tribal Implementation Plan" ("TIP"), similar to a SIP, to carry out the CAA's requirements on tribal land. 40 C.F.R. §§ 49.1–11; 63 Fed. Reg. 7,254 (Feb. 12, 1998). The TAR treats eligible tribes "in the same manner as States with respect to all provisions of the Clean Air Act and implementing regulations," except for mandatory plan submittal deadlines. 40 C.F.R. § 49.3; *see also id.* § 49.4. "Tribes may choose, but are not required, to adopt [TIPs] for their reservations. Because tribes are not required to adopt [TIPs], the TAR authorizes EPA to promulgate [FIPs] to fill

in any gaps." *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1119 (10th Cir. 2009) (*APS*). When a Tribe chooses not to issue a TIP, the EPA must "promulgate without unreasonable delay such Federal implementation plan provisions as are necessary or appropriate to protect air quality." 40 C.F.R. § 49.11(a).

The TAR also exempted tribes from certain CAA requirements because States were farther along in "developing air planning and implementation expertise." 63 Fed. Reg. at 7,265. For example, the TAR permits the EPA more time to promulgate a FIP for a tribe than for a State, and exempts tribes from "specific visibility implementation plan submittal deadlines established under section 169A of the Act," 42 U.S.C. § 7491. 40 C.F.R. § 49.4(e).

### D. The Station and its FIP

#### 1. The EPA's Initial Proposal

The Navajo Nation did not issue a TIP for the Station, so in February 2013 the EPA issued a proposed FIP under the TAR. Relevant here, the FIP proposed both a BART determination and a BART alternative. Under the BART determination, the Station would reduce its NOx emissions by nearly 80% within five years after the effective date of a final FIP, largely through the installation of both catalytic reduction and low NOx burners/separated over-fired air technologies. 78 Fed. Reg. at 8,287–88. Under its BART alternative determination, the FIP extended the deadlines for achieving NOx emission reductions to 2023. *Id.* at 8,289. It also gave an emission "credit" for the Station's early and voluntary 2009–11 installation of the low NOx burners/separated over-fired air technology. *Id.*

The EPA proposed these alternatives so that the Station had "options for flexibility in achieving emissions reductions required" under the proposed BART determination. *Id.* at 8,288. Flexibility was necessary, the EPA concluded, because of the important economic and water issues tied to the future of the Station. *Id.* at 8,289.

## 2.   The EPA's Supplemental Proposal

After receiving feedback from the Technical Work Group ("TWG")[4] during the comment period, the EPA issued its supplemental proposal in October 2013. 78 Fed. Reg. at 62,509. Under this revised plan, the Station would cease conventional coal-fired power generation by the end of 2044. *Id.* at 62,521. The plan would impose a "lifetime cap" on total NOx emissions from 2009 to 2044, reduce power generation at the Station, and would incorporate an emission credit for the Station's early installation of the low NOx burners/separated over-fired air technology. *Id.* at 62,513–14, 62,521. The EPA concluded that this revised plan qualified as a better than BART alternative. *Id.* at 62,514–17.

## 3.   The EPA's Final Rule and Challenges

In August 2014, the EPA issued its final rule, which tracked its October 2013 supplemental proposal. 79 Fed. Reg. at 46,514. It finalized the longer deadline for emission reductions, as well as the emission credit. *Id.* at 46,518, 46,547. The EPA reiterated that a "more flexible, extended

---

[4] The TWG consisted of the U.S. Department of the Interior, the Navajo Nation, the Gila River Indian Community, the Salt River Project, the Central Arizona Water Conservation District, the Environmental Defense Fund and Western Resource Advocates. 78 Fed. Reg. at 62,512.

compliance schedule" was warranted due to (1) the Station's "unusual and significant challenges"; and (2) the EPA's discretion under the TAR.[5]  *Id.* at 46,515–16.  Petitions challenging this final rule were filed timely, and consolidated.

## II.  STANDARD OF REVIEW

Under the Administrative Procedures Act ("APA"), we uphold a final agency action unless it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2).[6]  The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Bahr v. EPA*, 836 F.3d 1218, 1229 (9th Cir. 2016) (citation and internal quotation marks omitted).

Further, agency interpretations of statutes and regulations may be entitled to deference.  An agency's interpretation of a statute it administers is governed under the two-step framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45 (1984).  The first step investigates whether Congress has addressed "the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court,

---

[5] The EPA also finalized that under the TAR, it was not "necessary or appropriate" to conduct a BART determination for particulate matter ("PM") emissions because they were "well controlled," and because the Station would be required to further reduce PM emissions pursuant to the Mercury and Air Toxics Standards ("MATS") rule.  79 Fed. Reg. at 46,531-32.

[6] The EPA's final action is reviewed under the APA rather than under the CAA, 42 U.S.C. § 7607(d)(9).  *See APS*, 562 F.3d at 1122 n.4.  The parties agree that the standards are equivalent.

as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43 (citation omitted). Under the second step, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

In addition, an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). When faced with ambiguous regulatory language, "we defer to the EPA's interpretation if it is reasonable, i.e., if it 'sensibly conforms to the purpose and wording of the regulations.'" *El Comite Para el Bienestar de Earlimart v. EPA*, 786 F.3d 688, 696 (9th Cir. 2015) (citation omitted).

Petitioners argue that the EPA's interpretation of the CAA and its implementing regulations should not be afforded deference here because: (1) the U.S. Government has a financial interest in the Station via the U.S. Department of the Interior's nearly 25% ownership stake in the Station; and (2) the EPA along with the U.S. Department of Interior and the U.S. Department of Energy issued a joint statement in January 2013 in which petitioners contend the EPA essentially agreed to minimize negative impacts on U.S. government ownership interests. We disagree.

The federal government's partial ownership of the Station does not weigh against affording deference to the EPA's interpretation of the CAA and its implementing regulations. Importantly, here the EPA does not have any self-serving or financial interest in the Station's continued operation. *Cf. Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 834 (9th Cir. 2009) (holding that *Chevron* deference was inappropriate where the agency itself, rather

than the U.S. government in general, had a financial interest in a particular statutory interpretation).

Further, the joint statement does not demonstrate that the EPA's interpretation was intended to protect the U.S. government's ownership interest in the Station. Rather, petitioners take phrases from the joint statement out of context, and overlook that the statement also provided that it "does not alter the[] authorities and responsibilities" of the various federal agencies overseeing the Station, including the EPA's "Clean Air Act regulatory role relating to air quality and visibility in the region, which includes promulgating Best Available Retrofit Technology (BART) requirements for [the Station]."

Accordingly, the federal government's partial ownership of the Station does not eliminate any deference to the EPA's interpretation of the CAA and its implementing regulations.

## III. DISCUSSION

### A. Applicability of Emission Reduction Deadlines to Instant FIP

#### 1. Statutory Deadline to Implement BART

Under the CAA, BART must be implemented "as expeditiously as practicable but in no event later than five years" after a SIP's approval or the promulgation of a FIP. 42 U.S.C. § 7491(b)(2)(A), (g)(4). Petitioners contend that the EPA failed to comply with this statutory deadline.

However, the CAA's five-year deadline does not apply here. By its terms, this statutory deadline only applies to BART, and here, the FIP promulgated a "better than BART" alternative – not BART. Therefore, the instant FIP is not

subject to the CAA's five-year deadline to implement BART.

### 2. Regulatory Deadline to Implement BART Alternative

Under the Regional Haze Regulations, for a BART alternative, a SIP must "require[] that all necessary emission reductions take place during the period of the first long-term strategy for regional haze." 40 C.F.R. § 51.308(e)(2)(iii). The parties dispute whether this regulatory deadline applies to the instant FIP promulgated in place of a *Tribal* Implementation Plan under the TAR, rather than under a *State* Implementation Plan.

### a. Applicability of TAR to the Station

As a preliminary matter, petitioners contend that the EPA could not issue the FIP under the TAR because the Navajo Nation contracted away its right to regulate the Station and, therefore, it was not a tribe eligible for "treatment as a State" and could not issue a TIP.[7]

The CAA authorizes the EPA "to treat Indian tribes as States." 42 U.S.C. § 7601(d)(1)(A). But the EPA may treat Indian tribes as States only if the tribe meets certain requirements, including "if the Indian tribe is reasonably expected to be capable, in the judgment of [the EPA], of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this chapter and all applicable regulations." *Id.* § 7601(d)(2)(C); *see also* 40 C.F.R. § 49.6(d). Further, "[i]n any case in which [the

---

[7] Contrary to the EPA's contentions, petitioners' argument is not waived because Yazzie sufficiently raised it during the comment period.

EPA] determines that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible, [the EPA] may provide, by regulation, other means by which [the EPA] will directly administer such provisions so as to achieve the appropriate purpose." 42 U.S.C. § 7601(d)(4).

Pursuant to this statutory authority, the EPA issued the TAR, 40 C.F.R. § 49.11(a). This section provides that the EPA shall promulgate "such Federal implementation plan provisions as are necessary or appropriate to protect air quality . . . if a tribe does not submit a tribal implementation plan meeting the completeness criteria . . . or does not receive EPA approval of a submitted tribal implementation plan." 40 C.F.R. § 49.11(a).

Petitioners argue that § 49.11(a) only applies when a tribe "eligible" for treatment as a State fails to submit an approved TIP, and here the Navajo Nation was not "eligible" for treatment as a State because it had contracted away its power to regulate the Station.

However, § 49.11(a) by its plain terms is not limited to "eligible" tribes who can be treated as a State. Rather, it applies so long as "a tribe" does not submit an approved TIP; it mentions nothing about a tribe's eligibility. 40 C.F.R. § 49.11(a). Moreover, the CAA, 42 U.S.C. § 7601(d)(4), authorizes the EPA to adopt a FIP when a tribe is not treated as a State (i.e., "[i]n any case in which [the EPA] determines that the Treatment of Indian tribes as identical to States is inappropriate or administratively infeasible"). Thus, the EPA's authority to promulgate a FIP for tribal areas under the TAR is not dependent on a tribe's eligibility for treatment as a State.

In sum, the EPA reasonably concluded that the TAR applied because the Navajo Nation had not submitted a TIP, which under § 49.11(a), gave the EPA authority to promulgate a FIP for NOx emissions at the Station. *See Auer*, 519 U.S. at 461 (an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation"); *see also Chevron*, 467 U.S. at 842–45 (setting forth standard for deferring to agency statutory interpretation).

### b. Applicability of Section 51.308(e)(2)(iii) to the FIP

Under § 51.308(e)(2)(iii), if a State implements a BART alternative, its SIP must "require[] that all necessary emission reductions take place during the period of the first long-term strategy for regional haze." 40 C.F.R. § 51.308(e)(2)(iii). The parties dispute whether the FIP for the Station is subject to this deadline.[8] We conclude that the EPA reasonably determined that it is not.

The EPA contends that § 51.308(e)(2)(iii)'s deadline only applies when a State adopts a BART alternative. It reasons that the deadline is explicitly tied to "the period of the first long-term strategy for regional haze," for which *States* were required to submit a plan by December 2007, but which *tribes* were not subject to under the TAR. *See* 40 C.F.R. § 49.4(e) (exempting tribes from "[s]pecific visibility implementation plan submittal deadlines established under section 169A of the Act"). We cannot say

---

[8] The parties also dispute whether the end of the first long-term strategy period under § 51.308(e)(2)(iii) is December 31, 2017, or December 31, 2018. The exact deadline is irrelevant because the key issue is whether the deadline in § 51.308(e)(2)(iii) applies at all.

that the EPA's interpretation of its own regulation – that § 51.308(e)(2)(iii) does not apply to tribes because tribes are not subject to the underlying deadline for long-term strategies – is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461.

The EPA contends that the TAR entitled it to establish different "necessary or appropriate" deadlines for the FIP. 40 C.F.R. § 49.11(a) (providing that the EPA shall promulgate "such Federal implementation plan provisions as are necessary or appropriate to protect air quality" where a tribe fails to submit an approved TIP); *see also* 79 Fed. Reg. at 46,533–34; 79 Fed. Reg. at 8,289.

Petitioners argue that the EPA's interpretation is contrary to the plain language and purpose of the CAA and its implementing regulations. They assert that any flexibility under the TAR applies only to "procedural," not "substantive," requirements of the CAA, or that it only applies to "*submission* deadlines, not *compliance* deadlines." *See* 40 C.F.R. § 49.4(e) (exempting tribes from "[s]pecific visibility implementation plan *submittal deadlines* established under section 169A of the Act" (emphasis added)); 70 Fed. Reg. at 39,158 ("Tribes are not subject to the *deadlines* for *submitting* visibility implementation plans and may use a modular approach to CAA implementation." (emphasis added)). Accordingly, petitioners contend that the TAR does not exempt tribal sources from meeting the substantive pollution reduction requirements for a BART alternative under the CAA, which purportedly includes § 51.308(e)(2)(iii)'s compliance deadline.

The Tenth Circuit's decision in *APS* is instructive. In *APS*, the court rejected the environmentalists' argument that a FIP promulgated in place of a TIP for the Four Corners

Power Plant on the Navajo Nation reservation in New Mexico was arbitrary and capricious because the FIP did not satisfy the SIP "completeness criteria." 562 F.3d at 1119–21. The court reasoned that the TAR "provides the EPA discretion to determine what rulemaking is necessary or appropriate to protect air quality and requires the EPA to promulgate such rulemaking. Nothing in § 49.11(a) requires the EPA – as opposed to a tribe – to submit a plan meeting the completeness criteria[.]" *Id.* at 1125. The court thus deferred to the EPA's interpretation of the TAR because it was not "plainly erroneous or inconsistent with the regulation," and denied the environmentalists' petition. *Id.* (citation omitted).

Importantly, *APS* did not hold that the TAR only excused tribes from meeting procedural requirements. Rather, the court also rejected the environmentalists' more substantive argument that "the TAR *requires* the EPA to implement a more stringent federal plan[.]"**[9]** *Id.* at 1124 (emphasis in original).

As recognized by *APS*, the TAR grants the EPA wide discretion to determine what rulemaking is required to protect air quality on tribal lands. Nothing in the TAR requires the FIP to comply with the regional haze deadline applicable to a SIP under § 51.308(e)(2)(iii).

Petitioners also argue that the instant FIP is inconsistent with a Four Corners FIP that, like here, concerned regional haze and NOx emissions.**[10]** The Four Corners FIP BART

---

**[9]** Further, contrary to petitioners' argument, *APS* did not suggest that a FIP must be stricter than a SIP (or a proposed FIP). *See* 562 F.3d at 1125.

**[10]** This Four Corners FIP differs from the one at issue in *APS*.

alternative complied with § 51.308(e)(2)(iii)'s requirement that "all necessary emission reductions take place during the period of the first long-term strategy for regional haze." 77 Fed. Reg. 51,620, 51,641 (August 24, 2012). However, the fact that the Four Corners FIP complied with the regulatory deadline does not establish that the TAR *as a rule* requires a FIP to comply with this deadline. Given that the Four Corners FIP had a longer timeframe to comply with the regulatory deadline (it was promulgated in 2012 rather than in 2014 like the instant FIP) the EPA could have simply exercised its discretion to determine that it was not "necessary or appropriate" to consider whether the Four Corners BART alternative required an extended deadline under § 49.11(a).

In sum, the EPA reasonably interpreted the TAR (40 C.F.R. §§ 49.4(e), 49.11(a)) and the Regional Haze Regulations (40 C.F.R. § 51.308(e)(2)(iii)) to conclude that the emission reductions deadline in § 51.308(e)(2)(iii) does not apply to FIPs for regional haze that are promulgated in place of TIPs. We must defer to this interpretation because it is not "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461.

## B. EPA's Determination that the FIP Alternative is "Better than BART" for NOx Emissions

Petitioners next challenge the EPA's determination that the FIP alternative is "better than BART," i.e., that it "will achieve greater reasonable progress than would have resulted from the installation and operation of BART." 40 C.F.R. § 51.308(e)(2)(i). Under the Regional Haze Regulations, there are three different methods to show that an alternative will result in "greater reasonable progress": (1) "[i]f the distribution of emissions is not substantially different than under BART, and the alternative measure

results in greater emission reductions," *id.* § 51.308(e)(3); (2) if the distribution of emissions is significantly different, "dispersion modeling" must be conducted, which focuses on visibility rather than emissions, *id.*; or (3) "otherwise based on the clear weight of the evidence," *id.* § 51.308(e)(2)(i)(E).

Here, EPA relied on the first method: that (1) the "distribution of emissions" is not substantially different under BART and the alternative; and (2) the alternative "results in greater emission reductions." *Id.* § 51.308(e)(3); *see also* 79 Fed. Reg. at 46,533.

### 1. "Clear Weight of the Evidence" Standard Inapplicable Here

As a preliminary matter, petitioners argue that the EPA failed to show "by the clear weight of the evidence" that its alternative achieves "greater reasonable progress" than BART. Petitioners also fault the EPA for not conducting visibility modeling for its BART alternative.

As described above, there are three *separate* methods to establish that an alternative is "better than BART." *See* 71 Fed. Reg. 60,612, 60,622 (Oct. 13, 2006) (2006 revision to BART Guidelines stating that the "weight of evidence" approach is "an *alternative* to the methodology set forth in section 51.308(e)(3)" (emphasis added)); *WildEarth Guardians v. EPA*, 770 F.3d 919, 934 (10th Cir. 2014) (concluding that a "state can use the two quantitative methods stated in § 51.308(e)(3) *or* apply a qualitative standard (the clear weight of evidence)" (emphasis added)). The "clear weight of the evidence" standard only applies to the third method. 40 C.F.R. § 51.308(e)(2)(i). Here, the EPA chose the first method, which does not incorporate the "clear weight of the evidence" standard. *Id.* § 51.308(e)(3). Similarly, the EPA was not required to conduct visibility

modeling, as that is only required under the second method. *Id.*

Therefore, under its chosen method, the EPA was only required to show that (1) the "distribution of emissions" is not substantially different under BART; and (2) the alternative "results in greater emission reductions." *Id.*

### 2. EPA Interpretation of "Distribution of Emissions"

Petitioners contend that the FIP did not meet the initial prong of the first method of demonstrating greater reasonable progress – showing that the "distribution of emissions" is not substantially different under BART and the FIP. The EPA concluded that the distribution of emissions is not substantially different between BART and the FIP's BART alternative because the "*geographic* distribution of emissions is similar" as both "apply to the same source" (i.e., the Station). 79 Fed. Reg. at 46,533 (emphasis added). As such, the EPA interpreted the phrase "distribution of emissions" under § 51.308(e)(3) to refer only to the *geographic* distribution of emissions (i.e., locations/sources of the emissions). Petitioners insist that "distribution of emissions" should also include the *temporal* distribution of emissions (i.e., the timing of the emissions).

The plain language of the regulation – "distribution of emissions" – does not indicate whether the distribution is geographic, temporal, or both. However, the EPA has consistently interpreted this phrase to refer to geographic distribution. *See, e.g.*, 77 Fed. Reg. 18,052, 18,075 (March 26, 2012); 70 Fed. Reg. at 39,137. The consistency of the EPA's interpretation weighs in its favor. *See Nat. Res. Def. Council v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008) ("As a component of whether an agency's interpretation is

permissible, we will take into account the consistency of the agency's position over time."); *see also Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir. 2006) (special deference due to Department of Labor's consistent interpretation of its own regulation).

Moreover, as the EPA notes, this interpretation is reasonable because where, as here, there is only one source being regulated, "if emissions are reduced . . . visibility in the impacted area is necessarily improved."

Further, while the EPA acknowledges that the timing of emissions reductions is important under the CAA and its implementing regulations, the key inquiry here is whether § 51.308(e)(3) requires the EPA to consider timing in evaluating the "distribution of emissions" prong.[11]  As explained above, the BART statutory deadline does not apply to a BART alternative.  Nor does the BART alternative regulatory deadline apply to this FIP promulgated under the TAR.  Petitioners have not shown that the EPA was required to incorporate timing in this comparison, or that the EPA's consistent interpretation of "distribution of emissions" (as referring to *geographic* distribution, not *temporal* distribution) is "plainly erroneous or inconsistent with the

---

[11] It is of note that the instant FIP contains timing requirements, albeit not as expeditious as petitioners would like.  The BART alternative has a lifetime cap on total NOx emissions from 2009 to 2044.  79 Fed. Reg. at 46,518.  In addition, conventional coal-fired power generation at the Station must cease by 2044.  *Id.*  Further, the Regional Haze Regulations set a goal of achieving natural visibility at all Class I areas by 2064.  40 C.F.R. § 51.308(d); *see also* 79 Fed. Reg. at 46,534 ("EPA . . . determin[ed] that the TWG Alternative is 'better than BART' based on achieving greater NOx emissions reductions over a similar geographic distribution, within the date of the goal specified in the [Regional Haze Regulations] of achieving natural conditions in 2064.").

regulation." *Auer*, 519 U.S. at 461. As such, we must defer to the EPA's interpretation.

### 3. The FIP's Inclusion of Emission Credit in Comparison of Emission Reductions

Putting aside the timing of emission reductions, petitioners also argue that the FIP's BART alternative does not actually "result[] in greater emission reductions" than BART, 40 C.F.R. § 51.308(e)(3), and therefore does not meet the second prong of the first method for demonstrating greater reasonable progress. The BART alternative incorporated an emission credit for the Station's voluntary 2009–11 installation of the low NOx burners/separated over-fired air technology. 78 Fed. Reg. at 62,513–14, 62,521. The EPA concedes that absent this credit, the BART alternative would not achieve greater NOx reductions than BART. The key issue is thus whether it was reasonable for the EPA to give the Station an emission credit when evaluating if the BART alternative "results in greater emission reductions" than BART under 40 C.F.R. § 51.308(e)(3).

Petitioners argue that the EPA's incorporation of the credit into its BART alternative calculation is unreasonable because it is inconsistent with the EPA's prior statements regarding BART for the Station. In particular, when the Station applied for a permit to install the low NOx burners/separated over-fired air technology, the EPA represented that the "early installation . . . will not affect the baselines for cost or visibility improvements in the BART determination, and therefore will not influence EPA's determination of the proper NOx reductions required to be achieved from BART." 78 Fed. Reg. at 8,284.

The EPA's BART determination was consistent with this prior statement. For its BART analysis, the EPA used a baseline period of NOx emission from 2001–03, prior to the installation of the low NOx burners/separated over-fired air technology. 79 Fed. Reg. at 46,535; 78 Fed. Reg. at 8,285. As such, the EPA did not consider the emission credit in its "five-factor analysis or BART determination for" the Station. 79 Fed. Reg. at 46, 535. Rather, the EPA only used the emission credit for "evaluating alternatives to BART." *Id.* Therefore, the EPA's incorporation of the credit into its BART alternative was not inconsistent with its prior statement.

Petitioners also argue that the EPA was inconsistent in factoring in the emissions credit when computing the emissions reductions under the BART alternative, but not when calculating reductions that would be attributable to BART. The credit, however, reflects the fact that the technology was installed years before it would have been required to be installed under BART. This is because the Station could have waited until it was required to implement BART before installing any emissions reduction technology. The credit thus reflects the reductions achieved years prior to the time they would have been required.

Moreover, as the EPA noted in its FIP, the TAR gave it discretion to allow a credit for the BART alternative. 79 Fed. Reg. at 46,535. As discussed above, the TAR grants the EPA wide latitude to determine what "Federal implementation plan provisions . . . are necessary or appropriate to protect air quality" for a source on tribal lands when there is no TIP. 40 C.F.R. § 49.11. Here, it was not unreasonable for the EPA to reward the Station through a credit for its early and voluntary installation of the low NOx

burners/separated over-fired air technology, which resulted in real and early emission reductions.

In sum, it was reasonable for the EPA to give the Station an emission credit when evaluating if the BART alternative "results in greater emission reductions," 40 C.F.R. § 51.308(e)(3), than BART. *See Auer*, 519 U.S. at 461; *see also Chevron*, 467 U.S. at 842–45. Accordingly, we defer to the EPA's reasonable determination that the FIP alternative was "better than BART," i.e., that it "will achieve greater reasonable progress than would have resulted from the installation and operation of BART." 40 C.F.R. § 51.308(e)(2)(i).

### C. EPA Decision not to Determine BART for Particulate Matter

Finally, petitioners contend that the EPA unlawfully failed to conduct a BART analysis or include any BART emission limits for PM for the Station. The EPA determined that it was not "necessary or appropriate" under TAR to conduct a BART determination for PM emissions because they were already "well controlled" and the Station would be required to further reduce PM emissions pursuant to the MATS rule. 79 Fed. Reg. at 46,531–32; 78 Fed. Reg. at 8,279. This was a reasonable exercise of the EPA's discretion under the TAR.

## IV. CONCLUSION

In light of the discretion that the EPA enjoys, we cannot conclude that, under these unique circumstances, the EPA acted arbitrarily and capriciously. We thus **deny** the petitions.

## **<u>Glossary of Acronyms</u>**

BART          best available retrofit technology

CAA           Clean Air Act (also, the "Act")

EPA           U.S. Environmental Protection
              Agency

FIP           Federal Implementation Plan

MATS          Mercury and Air Toxics Standards

NOx           nitrogen oxides

PM            particulate matter

SIP           State Implementation Plan

TAR           Tribal Authority Rule

TIP           Tribal Implementation Plan

TWG           Technical Work Group